NOTICE
Decision filed 07/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240906-U

NO. 5-24-0906

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| BRENDAN ST. PETERS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Madison County. |
| | ) | |
| v. | ) | No. 23-CH-82 |
| | ) | |
| CRAIG GIBBS and LAUREN GIBBS, | ) | Honorable |
| | ) | Ronald J. Foster Jr., |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's denial of plaintiff's motion for permanent injunction was against the manifest weight of the evidence where plaintiff possessed a private ownership right in real property pursuant to the subdivision plat.

¶ 2    Plaintiff, Brendan St. Peters, appeals the trial court's denial of his request for a permanent injunction related to his rights to use rights-of-way shown on the plat for the subdivision where he bought his home. For the following reasons, we reverse the trial court's order.

¶ 3                                    I. BACKGROUND

¶ 4    Brendan and Craig are next door neighbors in the Oxford Place subdivision. On November 28, 2023, Brendan filed a motion requesting an emergency temporary restraining order (TRO) and a preliminary injunction against Craig. The pleading alleged that Craig was building a turn-around gate with the purpose of keeping Brendan from using the private roads that were part of the

1

subdivision where Brendan lived. The first road included a 50-foot-wide street, labeled Oxford Drive on the subdivision plat, that ran the length of the subdivision property. The second road was a 30-foot-wide lane, labeled as "Private Drive" on the subdivision plat, running between Lots 1 and 2 of the subdivision. Brendan's claim of ownership was based on an "owner's certificate" that he acquired at the time of purchase of his lot in the subdivision, which provided access to the subdivision streets.

¶ 5　　The motion was supported by Brendan's affidavit which stated Brendan owned Lot 1 of the Oxford Place subdivision and Craig owned Lots 2-12 of the subdivision. It further stated that Brendan obtained Lot 1 at a tax sale and was told he would have access to Mary Drive, a public street in the Village of Godfrey, as well as the private section of the 50-foot-wide road, "Oxford Drive," and the private 30-foot-wide road, both of which bordered his property, as described in the recorded subdivision plat. Brendan further claimed that allowing Craig to build the gate would block his access to Lot 1. The motion was further supported by a copy of the March 31, 1992 "owner's certificate" that stated at the bottom of the legal description and the naming of the subdivision, Oxford Place, "The street shown hereon is a private street for the use of and shall be maintained by the lot owners." Brendan's motion was also supported by the Village of Godfrey May 17, 2022, meeting minutes discussing, *inter alia*, the paving of Mary Drive, a public road in the Village of Godfrey.

¶ 6　　Brendan's motion was set for hearing on December 5, 2023. Craig did not appear. On December 6, 2023, the trial court issued an emergency TRO/preliminary injunction. The TRO stated that Craig could not restrict Brendan's use of Mary Drive or the two private sections of road. A hearing for permanent injunctive relief was set for December 19, 2023.

¶ 7    On December 18, 2023, Craig filed a reply seeking denial of Brendan's requested injunction. The reply argued that Brendan's motion failed to name necessary parties including one fee simple owner and the Village of Godfrey. The reply further claimed there was no factual basis for Brendan's claim of irreparable harm. Craig argued that there were only two issues. The first was whether Brendan had the right to use the unimproved and unnamed 30-foot-wide strip of land, as platted, to gain access to the east side of Lot 1 in addition to his front access to Lot 1. The second issue was whether Brendan had the right to use the unimproved 50-foot-wide Oxford Drive right of way, as platted, east of Brendan's lot and into the undeveloped property owned by Craig.

¶ 8    Craig's reply was supported by an affidavit that admitted Brendan owned Lot 1 and further stated that Craig and his wife, Lauren, owned Lots 2-12 and all right of ways of the subdivision in fee simple by warranty deed as of January 27, 2022. The affidavit further stated that Oxford Place subdivision was a recorded subdivision development on file with the Village of Godfrey and acknowledged that Brendan purchased Lot 1 at a tax sale on March 18, 2019. Craig's affidavit stated that he had never restricted or attempted to restrict Brendan's access to Mary Drive or the 50-foot-wide road that was platted as Oxford Drive. He further stated that he received correspondence from Brendan's attorney on April 24, 2023, regarding Brendan's concerns about access to his property. Craig's attorney provided a response that stated:

> "My client's [*sic*] have absolutely no objection to your client's access to his Lot No. 1 from Oxford Drive across the entire frontage of his lot, which is shown as 106.17' on Plat of Oxford Place Subdivision. My client indicates that he has never blocked access to this portion of Oxford Drive and, in fact[,] has constructed a rock road from the right-of-way of Mary Drive. This rock road extends in front of your client's Lot [N]o. 1 and Lot

3

No. 2 of the subdivision. My client acknowledges the right of your client to use this rock road for access to your client's property along Oxford Drive."

¶ 9 Craig's affidavit further stated that the unimproved 30-foot-wide road in between Lots 1 and 2 was not required for Brendan's access to his lot. Craig agreed that Mary Drive was a public road on May 17, 2022, and that he requested assistance with the right-of-way improvement for Oxford Place at the Village of Godfrey meeting held that date. The affidavit further clarified that the Village Board initially moved to pay the $4,600 road improvement requested for Oxford Drive but after Brendan objected to the dust, the motion was withdrawn and the Village elected to just apply slag to the Mary Drive right-of-way. Craig's affidavit stated that access on Bluff Top Road [f/k/a "Private Street"] was unnecessary beyond the frontage of Lot 1 and, any improvements to Craig's property on Lot 2 only increased Brendan's access to Lot 1. Craig denied building any gate or restricting Brendan's access to his lot. Attached to the affidavit was the warranty deed from Ronald and Karen Cobine deeding Lots 2-12 as Parcel 1 and the roads listed as Parcel 2 to Craig and Lauren. The Parcel 2 property was listed as

"A strip of land 50' wide street, shown as Oxford Place Drive on the Plat of Oxford Place Subdivision as shown on the Plat thereof recorded in the Recorder's Office of Madison County, Illinois in Plat Cabinet 57 Page 125. ALSO: a 30' wide private street East and Southeast of Lot One (1) of Oxford Place Subdivision as shown on the Plat thereof recorded in the Recorder's Office of Madison County, Illinois, in Plat Cabinet 57 Page 125."

Also attached to Craig's affidavit was a copy of the Oxford Place subdivision plat and the correspondence from Craig's attorney to Brendan's attorney.

4

¶ 10    On December 21, 2023, an agreed order was entered into between the parties. In the order, Brendan agreed "to not use any part of the undeveloped private 50' road beginning immediately after the private 30' Street right of way." Craig agreed "to allow Plaintiff access and use of the private 30' street right of way for the purpose of access to Plaintiffs Lot 1" and stated he would "not obstruct, impede, or restrict [Brendan's] access and use of the same." The agreed order did not require Craig to remove the trees and bushes planted prior to December 19, 2023, and instead precluded Brendan from parking or storing any vehicles, objects or materials, or modifying "the 30' private street right of way in any way." The agreed order was to remain in effect until the court issued a decision on the motion for injunctive relief, or the parties reached a settlement.

¶ 11    On February 27, 2024, Brendan moved to file an amended pleading. The motion was granted on March 4, 2024. The amended pleading added Lauren Gibbs as a necessary party and made no further amendment. On March 25, 2024, Craig filed a reply substantially similar to that previously provided. An additional reply was filed by Lauren Gibbs that was nearly identical to Craig's reply and included an affidavit and the other exhibits relied on in Craig's affidavit, namely the Warranty Deed for the purchase of the lots in the subdivision and correspondence between counsel.

¶ 12    A hearing on the permanent injunction was held on March 26, 2024. No transcript was provided; however, the parties did provide an agreed statement of facts related to the hearing. Four witnesses provided testimony. Brendan and Fred Michael testified for Brendan. Craig and Coey Daniels testified for Craig. The facts submitted indicate that Brendan purchased his property at a tax sale in 2019. Craig and Lauren obtained their property in 2022. Both parties received owner's certificates and neither party disputed the validity of the subdivision plat. They also agreed the subdivision was never vacated. The subdivision plat provided a description of the property

5

involved along with a photograph of the 12 property divisions. Lots 1-7 were on the East Side of "Oxford Drive." Lots 8-12 were on the West side of "Oxford Drive." A "Private Street" was also marked between Lots 1 and 2. Following the property description on the subdivision plat it stated, "The street shown hereon is a private street for the use of and shall be maintained by the lot owners."

¶ 13    Brendan testified that prior to purchasing the lot, he spoke with Fred Michael and others regarding whether he needed to purchase right-of-way parcels. He was informed that the purchase was unnecessary based on the owner's certificate conveyance. He testified that when he purchased the property, the 50-foot right-of-way up to the 30-foot right-of-way, and 30-foot right-of-way had a base layer of asphalt. He and people in the adjoining subdivision used this right-of-way freely. He stated that after Craig and Lauren purchased the property, Craig began impeding Brendan's access to the 30-foot right-of-way by placing cinder blocks and other obstacles on the right-of-way. He testified that Craig eventually dug up the asphalt base layer of the 30-foot right-of-way and planted trees in it. Brendan identified a picture showing the trees in the right-of-way.

¶ 14    It was Brendan's position that he was entitled as a lot owner to use all rights-of-way platted on the recorded subdivision plat map. He admitted that he did have access to the entire south line of Lot 1 through Mary Drive and the road Craig constructed up to Lots 2 and 3. He further admitted that he owned property adjacent and contiguous to the west line of Lot 1 and that property had access to Clara Drive as recorded in the Edgewood Terrace subdivision plat. Brendan agreed that he had been able to use the 30-foot private road for access to the west side of his Lot 1 since December 21, 2023, and used the property to walk his dog and clear the area with a leaf blower and also allowed his son to ride his bike there.

¶ 15    Fred Michael testified that prior to his retirement, he worked in the Madison County Maps and Plats Division for 25 years. He identified two rights-of-way labeled as "Oxford Drive" and "private street" on the subdivision plat map. He stated that as long as the subdivision was not officially vacated, it remained a subdivision. He stated that both Lots 1 and 2 had two street frontages, one along the 50-foot right-of-way and the other along the 30-foot right-of-way making them corner lots, which required minimum distances from those frontages when constructing structures on those lots. He stated that based on the owner's certificate, all lot owners, including Brendan, would have the right to use the rights-of-way. He stated that rights-of-way were platted and owned by an individual during the development of the subdivision. He explained that this was why the owner's certificate was a requirement to the final plat and expressly stated that even though the rights-of-way were owned by an individual, the rights-of-way were for the use of all lot owners and were never for the exclusive use of the individual owner. Mr. Michael also identified the "authorization to record" which was used to personally record the final plat and associated documents. Mr. Michael recalled his previous discussions with Brendan regarding Lot 1 and his use of the rights-of-way. He opined then, as well as at the hearing, that Brendan had the right to use the rights-of-way.

¶ 16    On cross-examination, Mr. Michael explained that his prior job involved reviewing the plats for compliance and he had no role after the plat was recorded to see whether streets were built or whether any governmental entity accepted the streets. He admitted there may be other requirements in the subdivision ordinance that precluded use of the right-of-way that he would not be involved with once the plat was approved and recorded. He then read the Madison County subdivision ordinance definition of "street." Street was defined as "[a] public or private way for motor vehicle travel" and included a highway, thoroughfare, parkway, throughway, road, pike,

7

avenue, boulevard, lane, place, drive, court, and similar designations, but excluded an alley or a way for pedestrian use only. He agreed it was not his responsibility to determine when a street was accepted or useable for motor vehicle travel. He further agreed that even if the 30-foot right-of-way was vacated, lots of the subdivision, including Brendan's, would still have access to the 50-foot right-of-way labeled Oxford Drive.

¶ 17    Craig testified that he bought the entire subdivision, except for Lot 1, and his purchase included the 50-foot right-of-way identified as "Oxford Drive" and the 30-foot right-of-way identified as "Private Street." He stated those rights-of-way were totally undeveloped. He and his wife Lauren constructed a house on Lots 2 and 3. He stated there was a public street named Mary Drive that provided access to Oxford Drive at the west line of the subdivision. He stated that he never tried to assert ownership of Mary Drive and agreed that he requested the Village place rock on the stub street section to the beginning of Oxford Drive. He would then construct a rock road on the right-of-way of Oxford Drive up to the 30-foot right-of-way as a driveway to serve his newly constructed home. He stated that he never denied access to Brendan's lot from Mary Drive or along the southerly line of Lot 1 along Oxford Drive. He opined that the 30-foot right-of-way was not needed by Brendan to have access to Lot 1 and that at the time he purchased the property, the 30-foot private road had construction debris on it. Craig stated he had no intention of developing the subdivision or selling the other lots. He testified that the 30-foot private street ended on the north line of subdivision abutting private property with no outlet. He stated that Oxford Drive east of the intersection with the 30-foot private street was an undeveloped field, which he considered his private yard. He stated the 30-foot private road was not paved. He explained that his address on Blufftop Lane (previously part of the 30-foot private street) was determined by the fire chief and village engineer, and he considered the road to extend from Clare Drive over the

Mary Drive stub street, and the Oxford Lane right-of-way to the 30-foot private street, which became his driveway. He had not vacated the Oxford Place subdivision despite his plan to not sell or develop the remaining lots or rights-of-way shown on the plat. He read the owner's certificate to refer only to a private street, not private streets. He also reviewed the street definition and said, "the right-way of Oxford Drive, east of his home past the intersection with the 30' right of way, north of his driveway, [were] all undeveloped and not for motor vehicle travel." He stated that neither a maintenance agreement nor an access easement was in place for his property. He stated that Brendan was never charged or paid any maintenance expenses or taxes toward the cost of maintaining the private rights-of-ways. He showed several videos of Brendan using the 30-foot private right-of-way for purposes beyond ingress and egress by routinely walking his dog, hiking with his family, bike riding by his family members, and using his lawn tractor on the right-of-way.

¶ 18    On cross-examination, Craig did not dispute that Brendan was a lot owner within the Oxford Place subdivision. He denied digging up the 30-foot base layer on the right-of-way and stated there was construction debris on the area prior to his ownership. He admitted planting trees in the center of the 30-foot right-of-way.

¶ 19    Coey Daniels, a professional engineer, worked for Shepard Morgan & Schwaab, Inc., which involved civil engineers and land surveyors, in Alton, Illinois. The subdivision plat was previously prepared by his firm on March 27, 1992. He agreed that the owner's certificate used the singular form when it stated, "The street shown hereon is a private street for the use of and shall be maintained by the lot owners." He identified the preliminary sketches of the subdivision. He drew a house in the upper right-hand corner of the plat, outside the subdivision, and a sketch of the 30-foot strip of land appearing to provide access to the house drawn. To the best of his

9

knowledge there was not a separate recorded access easement in existence or a separate recorded maintenance agreement from that shown on the subdivision recorded plat.

¶ 20 On cross-examination Mr. Daniels identified two rights-of-way on the subdivision plat map. He agreed it was a final recorded plat map and remained a subdivision until it was vacated. Mr. Daniels also reviewed preliminary plat sketches for Oxford Place. The first sketch revealed that the 30-foot right-of-way was created by taking 15 feet from Lot 1 and Lot 2. Sketch 2 revised where the 30-foot right-of-way was placed, taking more from Lot 1 than Lot 2 because they could not use land that was part of the lot adjoining Lot 2, because that land was not part of Oxford Place Subdivision. He agreed that based on the owner's certificate, all lot owners, including Brendan, had the right to use the rights-of-way. He testified that in his expert opinion, after his review of the recorded final plat and associated documents including the owner's certificate that Brendan as a lot owner had the right to use all platted rights-of-way within Oxford Place as platted on the recorded final plat. Following the hearing, the trial court had the parties submit proposed orders.

¶ 21 On March 28, 2024, the trial court issued an order addressing Brendan's request for a permanent injunction. It found that Brendan did not have a protectable interest based on the Madison County Subdivision Ordinance that defined "street" as well as its requirements for private lanes and maintenance agreements. The court found that "no street or lanes have been developed[,] *** no maintenance agreement has been recorded" and the ordinance only required a final plat "to include an access easement." Because it found Brendan did not have a protectable interest, the permanent injunction was denied. The order further stated that Brendan had "the right of access to his Lot 1 via the public street Mary Drive as well as the private 50' right-of-way platted as Oxford Drive along the southerly border of Plaintiff's Lot 1, ending at the right-of-way platted as '30' Private Street; now named 'Bluff Top Lane.' " Craig and Lauren were ordered not to obstruct

10

access to Lot 1 along the portion of the 50-foot right-of-way described above. Brendan was ordered not to enter upon or use any portion of the undeveloped 50-foot right-of-way platted as Oxford Drive beyond the intersection of Oxford Drive and the 30-foot right-of-way platted as a 30-foot private street, until such time as the 50-foot right-of-way of Oxford Drive was developed and constructed as a street upon which vehicular traffic could travel. Brendan was further ordered to not enter upon, walk, drive his lawn maintenance equipment, blow leaves, or for any other reason enter upon the 30-foot right-of-way platted as a 30-foot private street, now renamed as Bluff Top Lane, until such time as Bluff Top Lane was developed as a private street capable of supporting vehicular traffic. Brendan was also ordered not to remove any trees or bushes planted by Craig and Lauren on the 30-foot right-of-way. Each side was to pay their own costs and attorney fees.

¶ 22     On April 29, 2024, Brendan moved for reconsideration. The motion argued that contrary to the trial court's finding that there was no maintenance agreement for the lots, there was a recorded maintenance agreement within the owner's certificate, which had been placed into evidence. The motion also took issue with the fact that the trial court seemed to indicate that a right-of-way could not exist unless it was developed and met the minimum standards of applicable development standards but then it referred to the private 30-foot right-of-way as Bluff Top Lane, which was undeveloped and now had trees planted within it. The motion also questioned the use of the current definitions of private street and private lane as amended in 2002, claiming they might not represent the same thing in 1992 when the plat at issue was recorded. It further noted that the Madison County subdivision Ordinance in effect in 1992 only applied because the Village of Godfrey did not have their own subdivision ordinance at that time. Now, however, the Village of Godfrey's current ordinances should apply before the county ordinance because Madison County ordinances only apply where no local ordinances exist. The motion then cited the Village of

11

Godfrey ordinances and stated that the subdivision at issue was validly subdivided and platted as reflected on the final plat and as required by the local ordinances. This fact was supported by three expert witnesses who testified that the plat and owner's certificate were recorded as part of the final plat and the final plat would not have been recorded had it not met all the requirements at that time. Brendan further argued that three witnesses also testified that Brendan had the right to use all rights-of-way within the subdivision at issue. It stated that the court's reliance on "private lane" was in error because the Madison County ordinance was inapplicable and only "private street" was applicable. Brendan also disputed that the current rights-of-way were undeveloped because he provided evidence at the hearing that the 30-foot right-of-way was developed prior to Craig and Lauren purchasing their lots and it was not until Craig and Lauren unilaterally ripped up the asphalt base layer that it became "undeveloped." Brendan argued that Craig and Lauren could not unilaterally un-develop a right-of-way as that would be considered a vacation and then cited Madison County Subdivision Ordinance section 92.07, which defined vacate as "to terminate the legal existence of a right of way or subdivision, and to so note on the final plat recorded with the Recorder of Deeds." It also cited the Village of Godfrey ordinance regarding vacated lots.

¶ 23    On July 10, 2024, Craig objected to the motion to reconsider. The motion was argued on July 11, 2024, and the trial court took the matter under advisement. On July 12, 2024, the trial court issued an order denying the motion to reconsider. Plaintiff appeals.

¶ 24                                        II. ANALYSIS

¶ 25    Brendan raises three issues on appeal. He first contends that the trial court misapplied the law when it used the Madison County ordinance definition of "street" to conclude he did not have a protectable interest in his right to use a platted right-of-way within the Oxford Place subdivision as a lot owner. He then alleges that the trial court misapplied the law when it relied on the Madison

12

County road maintenance definitions to convey usage rights. Finally, Brendan argues that the trial court erred in issuing a ruling rescinding his property rights by applying an ordinance that no longer governed the subdivision and ignoring the validly recorded subdivision and owner's certificate which expressed the lot owners' rights and was consistent with the expert witness testimony confirming his right to use both of the Oxford Place subdivision rights-of-way.

¶ 26　In response, Craig argues that the majority of Brendan's arguments were forfeited as they were only raised in Brendan's request for reconsideration; the reconsideration relied on evidence that was not submitted at trial; and no basis for the additional late argument was provided as required for a reconsideration request. He further argues that his witness, Coey Daniels, was not an expert and an objection was raised as to his classification as such at trial. Craig also argues that the trial court applied the correct law, and its ruling was not against the manifest weight of the evidence.

¶ 27　"The party seeking a permanent injunction must demonstrate (1) a clear and ascertainable right in need of protection, (2) irreparable harm if injunctive relief is not granted, and (3) no adequate remedy at law." *Sparks v. Gray*, 334 Ill. App. 3d 390, 395 (2002). "[P]ermanent injunctions are designed to extend or maintain the status quo indefinitely when the plaintiff has shown irreparable harm and *** no adequate remedy at law." *Id.* at 396. "Generally, a reviewing court will not overturn a trial court's order concerning a permanent injunction unless that order is against the manifest weight of the evidence." *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 22. "A judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence, or when an opposite conclusion is apparent." *Id.* ¶ 23 (citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995)). "However,

13

when the appeal of an order granting or denying a permanent injunction involves a question of law, the standard of review is *de novo*." *Id.* ¶ 22.

¶ 28 Before we address the merits of the appeal, we first consider Craig's claim that many of Brendan's arguments were forfeited because they were first raised in his motion for reconsideration. "The purpose of a motion for reconsideration is to inform the trial court of (1) newly discovered evidence previously unavailable at the time of the original hearing, (2) changes that have occurred in the law since the original hearing, or (3) errors in the court's earlier application of the law." *Weidner v. Midcon Corp.*, 328 Ill. App. 3d 1056, 1061 (2002). "A reconsideration motion is not the place to raise a new legal theory or factual argument." *Zahdan v. Frontline Business Enterprise, Inc.*, 2024 IL App (1st) 221351, ¶ 44. "Legal theories and factual arguments not previously made are subject to forfeiture." *Id.*

¶ 29 Here, Brendan's arguments in his reconsideration motion contended that the trial court erred in finding Brendan did not have a protectible interest. It claimed the court misapplied the law by relying on the Madison County ordinance to determine whether he had a protectible interest. The reconsideration motion also contended that the court's conclusions were controverted by the record, internally inconsistent as to whether the 30' right-of-way was developed or undeveloped, and further argued the court ignored the expert testimony that confirmed the lot owners have a right to use all the platted rights-of-way within the Oxford Place subdivision. We agree that Brendan's reliance on the Village of Godfrey ordinances was a new argument. However, his reliance was simply to illustrate how the trial court erred in its application of the Madison County ordinances. Because Brendan's arguments in both the reconsideration motion and on appeal are based on the trial court's application of the law, we cannot find the argument was forfeited.

14

¶ 30    Therefore, we turn to the issue of whether the trial court erred in denying Brendan's request for a permanent injunction. In denying Brendan's request for a permanent injunction, the trial court held that he did not have a protectable interest in the property. We disagree.

¶ 31    In *Wattles v. Village of McHenry*, 305 Ill. 189, 192 (1992), the Illinois Supreme Court summarized property owner rights in the streets, alley, and public places laid out in a public subdivision stating:

> "No law is better settled in this state than that which controls this case. Where the owner of land lays it out in lots and blocks and makes and exhibits a plat thereof showing streets and alleys and sells some of the lots with a clear reference to the plan, the purchaser acquires as appurtenant to the lots every easement, privilege, and advantage which the plan represents as belonging to them as a part of the platted territory. This privilege is not limited to the purchaser, but is a right vesting in the purchaser that all persons whosoever, as their occasion may require, may use the streets, alleys[,] and other public places according to their appropriate purposes. The sale and conveyance of lots according to a published plat implies a grant or covenant to the purchaser that streets, alleys, and other public places indicated as such upon the plat shall be forever open to the use of the public, free from all claim of interference of the proprietor inconsistent with such use."

¶ 32    The Illinois Supreme Court decision is further bolstered by *Ruble v. Sturhahn*, 348 Ill. App. 3d 667, 674 (2004) (citing *Bond v. Dunmire*, 129 Ill. App. 3d 796, 805 (1984)), which held that, "A party who purchases land in a subdivision with reference to a recorded plat acquires a right to have the streets and alleys remain open to all who would use them." "These rights, which one acquires when purchasing property with reference to a plat, are private rights." *Id.* at 675 (citing

*Welter v. Eaton*, 366 Ill. 143, 147 (1937)). The private right applies to both "platted streets and roads not yet in existence." *Id.* (citing *Zearing v. Raber*, 74 Ill. 409 (1874)).

¶ 33    Here, there is no dispute that Brendan purchased his property in 2019 and said property was part of a subdivision plat recorded with the county recorder that contained an owner's certificate providing access to the easements and streets. With this purchase, Brendan received the private interest rights that gave him access to all platted streets, whether they were improved or not. It was undisputed that the subdivision plat was never vacated and that both the subdivision plat and owner certificates provided usage rights for the private streets and placed any obligation for maintenance of the roads on the lot owners.

¶ 34    Given these undisputed facts as well the Illinois Supreme Court law confirming Brendan's private property rights established by the plat, we hold that the trial court's finding that Brendan did not possess a protectable interest in the rights-of-way was erroneous as a matter of law and therefore, was also against the manifest weight of the evidence. As such, Brendan satisfied the first step toward obtaining a permanent injunction in that he has a clear and ascertainable right in need of protection.

¶ 35    The remaining requirements for a permanent injunction are irreparable harm if the injunctive relief is not granted and no adequate remedy at law. *Sparks*, 334 Ill. App. 3d at 395. "An alleged injury is defined as irreparable when it is of such nature that the injured party cannot be adequately compensated with monetary damages and damages cannot be measured by pecuniary standards." *Ron & Mark Ward, LLC v. Bank of Herrin*, 2024 IL App (5th) 230274, ¶ 62. " 'To demonstrate irreparable injury, the moving party need not show an injury that is beyond repair or compensation in damages, but rather need show only transgressions of a continuing nature.' " *Victor Township Drainage District 1 v. Lundeen Family Farm Partnership*, 2014 IL App

16

(2d) 140009, ¶ 50 (quoting *Bollweg v. Richard Marker Associates, Inc.*, 353 Ill. App. 3d 560, 577 (2004)).

¶ 36 There was no dispute that Craig did not believe that Brendan had a protected interest in occupying the platted, undeveloped streets in the Oxford Place subdivision. Craig took the position that Brendan only had limited rights which gave Brendan access to Lot 1. Craig had also planted trees and bushes on the 30-foot right-of-way, thereby undermining its character as a "private lane" and interfering with Brendan's private property rights. Craig's interference with Brendan's rights was a continuing transgression as Craig intended to interfere with Brendan's private rights in access to all of the rights-of-way platted on the Oxford Place subdivision plat. Accordingly, we hold that irreparable harm was shown.

¶ 37 Finally, the third element requires a plaintiff to show there is no adequate remedy at law. *Sparks*, 334 Ill. App. 3d at 395. An inadequate remedy at law is a "legal remedy (such as the award of damages) that does not sufficiently correct the wrong, as a result of which an injunction may be available to the disadvantaged party." Black's Law Dictionary (12th ed. 2024). One of the main questions for this element is "whether the plaintiff will be made whole if he prevails on the merits." (Internal quotation marks omitted.) *Ward*, 2024 IL App (5th) 230274, ¶ 62. Here, Brendan's requested injunctive relief was for continued access to rights-of-way in the subdivision for which he held an owner's certificate as a lot owner. A right-of-way is defined as a "strip of land subject to a nonowner's right to pass through." Black's Law Dictionary (12th ed. 2024). Monetary damages will not suffice to remedy the situation where the issue pertains to continuing, unobstructed access to property rights. This private right of action does not have a monetary value attached to it, and thus there is an inadequate remedy at law.

¶ 38   As all three requirements for a permanent injunction were met, the trial court's denial of the permanent injunction was against the manifest weight of the evidence. Brendan was entitled to a permanent injunction granting him full access to the platted rights-of-way shown on the Oxford Place subdivision plat, whether or not the right-of-way had been improved. Accordingly, the trial court's order denying Brendan's request for a permanent injunction is reversed.

¶ 39                               III. CONCLUSION

¶ 40   For the above-stated reasons, the trial court's order denying Brendan's request for a permanent injunction is reversed and we remand the case back to the trial court to issue an order consistent with this decision.

¶ 41   Reversed and remanded.